# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## (Alexandria Division)

| | |
|---|---|
| GREGORY H. MARCUS, and <br> JAIME N. MARCUS, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARLENE DENNIS and <br> MARLENE DENNIS DESIGN, LLC, <br><br> *Defendants*. | Case No: 1:21-cv-1085 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Greg and Jaime Marcus allege and state the following against the defendants Marlene Dennis and her company Marlene Dennis Design, LLC (collectively "Dennis"):

## Introduction

1. Greg and Jaime Marcus hired Marlene Dennis and her company Marlene Dennis Design to help design their dream home, and procure the items to furnish it. The contract stated that Dennis would provide the third-party invoices to the Marcuses "in an orderly manner, tied to the furniture spreadsheet and placed in a shared drop box," as a means to ensure that Dennis was accurately passing along the charges from third parties without markup. But instead of buying the selected items from third parties and charging the Marcuses the amount reflected in the third-party invoices (which she would provide): (a) Dennis asked the Marcuses to entrust her with approximately $250,000 from which she would pay the third parties directly as their agent; (b) actively concealed the third-party costs from the Marcuses, and took steps to prevent others from disclosing that information as well; and (c) overinflated the cost of those third-party items and pocketing the excess herself.

2. In addition, although the contract limited Dennis's hourly compensation to $50,000 for design work and $50,000 for furniture procurement, Dennis demanded that the Marcuses exceed the services cap, and then effectively stopped working when another homeowner hired her to work on a bigger project at a higher hourly rate. The Marcuses ended up paying Dennis $124,722.41 for her hourly services, and then were forced to pay $85,114.50 (and counting) to hire another design team to complete the job they had already paid Dennis to perform.

3. This complaint alleges that Dennis breached the contract by (1) refusing to work unless the Marcuses paid her more than the contracted-for hourly services cap (which they reluctantly did); (2) secretly overinflating third-party costs and pocketing the difference; and (3) ultimately quitting and forcing the Marcuses to hire someone else to complete the job. This conduct also breached the fiduciary duty that arose from Dennis's post-contract request that the Marcuses entrust her with over $250,000 for her to use to purchase items directly from third parties as her agent, and it also violated the Virginia Consumer Protection Act.

**Parties**

4. Plaintiffs Greg and Jaime Marcus are a married couple whose primary residence and domicile is located in Bethesda, Maryland.

5. Defendant Marlene Dennis is a professional interior designer whose primary residence and domicile, on information and belief, is 6532 Walnutdale Lane, The Plains, Virginia 20198-2031.

6. Defendant Marlene Dennis Design, LLC, is a Virginia limited liability company owned by Defendant Dennis and whose principal place of business, on information and belief, is Marlene Dennis's home at 6532 Walnutdale Lane, The Plains, Virginia 20198-2031.

## Jurisdiction and Venue

7. Subject matter jurisdiction over this matter is conferred upon and vested in this Court based upon diversity of citizenship under 28 U.S.C. § 1332.

8. This Court has personal jurisdiction over each defendant.

9. Venue is proper in this Court because (a) all defendants are residents of the Commonwealth of Virginia; and (b) a substantial part of the events and omissions giving rise to the claim occurred in the Commonwealth of Virginia.

10. This action has been brought within all applicable statute of limitations and/or repose.

## Factual Background

**A. Dennis and the Marcuses Execute a Contract for Services (October 2018).**

11. On October 15, 2018, the Marcuses and Marlene Dennis (on behalf of Marlene Dennis Design, LLC) entered into a contract for design services relating to the construction and furnishing of a new home located at 5201 Hampden Lane, Bethesda, MD 20814. A copy of the contract is attached as Exhibit A.

12. Under the contract, Dennis (as "Designer") would provide consulting services to design the new home for the Marcuses (the "Client")—including color palettes, flooring, wall coverings, finishes, furniture, and fixtures—and arrange and oversee the procurement and installation of many of those items. Ex. A, 1–2.

13. Under the bold underlined heading "Compensation," the contract provided:

**Contract Fees**

Client agrees to compensate Designer $175 per hour, not to exceed $50,000, for design consultation and $50,000 for furniture selection and procurement. Designer will invoice client monthly. Furniture invoices will be saved in an orderly manner, tied to the furniture spreadsheet and placed in a shared drop box.

**Expenses**

Client will be invoiced monthly for expenses directly related to Client's Project. Such expenses may include, but are not limited to: courier, express delivery, postage, and storage of any items that cannot be delivered due to construction.

Furnishings, rugs, artwork, decorative lighting and accessories not to exceed $250,000. Assumes Client will use and/or re-purpose much of what they currently own. Designer and client to review Furniture Plan and agree on the items to be re-purposed and to confirm that $250,000 is an appropriate amount given the items required.

Ex. A, 2–3.

**B.     Over the course of the project, Dennis charges more than the $100,000 in "Contract Fees" permitted by the contract.**

14.     Dennis began work on the project shortly after the contract's execution in October 2018.

15.     In November 2020, she sent an invoice (Invoice 1033) reflecting time allegedly devoted to the project over a 15-month period from July 15, 2019 through November 2, 2020, totaling nearly $68,000 at the contractual hourly rate of $175 per hour.

16.     Along with the invoice, Dennis informed the Marcuses that once the invoice was paid, the total "Contract Fees" would exceed the contractual cap of $100,000.

17.     On information and belief, Invoice 1033 did bring the total amount of charged compensation in excess of the amount ($100,000) by which the contract stated the Contract Fees were "not to exceed."

18.     Despite the contract's clear language capping Dennis's "Contract Fees" at $50,000 for "design consultation" and $50,000 for "furniture selection and procurement" (Ex. A, 2), Dennis continued to send invoices to the Marcuses for services far in excess of the contractual caps.

19.     All told, the Marcuses paid $124,722.41 for Dennis's hourly services, which was less than the full amount Dennis continues to demand for those services.

4

**C. Although the contract contemplates that Dennis would buy all furniture and fixtures in advance and then pass along the charges to the Marcuses (with the third-party invoices as proof), Dennis suggests that it will be more convenient if the Marcuses pay Dennis in advance, and have her pay the vendors as the Marcuses's agent and with the Marcuses's money.**

20. The contract clearly contemplates that Dennis's role vis-à-vis paying furniture vendors was to purchase furniture and fixtures in advance, and then charge the Marcuses in a manner that includes proof of the underlying payment. *See* Ex. A at 2–3 ("Designer will invoice client monthly. Furniture invoices will be saved in an orderly manner, tied to the furniture spreadsheet and placed in a shared drop box. . . . Client will be invoiced monthly for expenses directly related to Client's Project.").

21. But in January 2021, Dennis emailed the Marcuses an "invoice" for $255,560.72 ($241,095.02 plus $14,465.70 "Sales Tax") with the following notation:

| Quantity | Description | Price Each | Amount |
|---|---|---|---|
| 0.7 | Furniture per Spreadsheet Dated 1.27.21 (Attached) | 344,421.45 | 241,098.02T |

22. Accompanying the invoice was a 382-row Excel spreadsheet with the following columns (A) Location/Item; (B) Image; (C) Description; (D) Quantity; (E) Each; and (F) Total.

23. Column F ("Total") reflected either (i) the cost listed in Column E ("Each"), if Column D ("Quantity") was blank; or (ii) Column E ("Each") multiplied by Column D ("Quantity"), if Column D ("Quantity") contained a nonzero digit. For example:

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Location/Item | Image | Description | Quantity | Each | Total |
| 11 | Towels | | RH<br>802 Gram Turkish Hand Towels<br>17050043 PEWT<br>Pewter | 4 | 18.00 | 72.00 |
| 12 | Trash Can | | iDesign Cade Slim Bathroom Trash<br>White<br>10.56 x 5.5 x 9.77 | | 15.23 | 15.23 |

24. The bottom of the spreadsheet included a line for "Sub Total" (which added up the total in the "Total" column), "Sales Tax" (the Sub Total multiplied by 6%), and "Total" (Sub Total plus Sales Tax).

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 378 | | | | | Sub Total | $344,421.45 |
| 379 | | | | | Sales Tax | $20,665.29 |
| 380 | | | | | Total | $344,421.45 |
| 381 | *Freight & Delivery Additional | | | | | |
| 382 | * Prices Subject to Change Without Notice | | | | | |

25. Dennis suggested that the Marcuses would obtain furniture more quickly if—instead of paying vendors directly—they sent the money in advance to Dennis instead, and she would pay the vendors directly as the Marcuses' agent.

26. The Marcuses sent Dennis a wire for $255,000 shortly thereafter, on February 2, 2021.

D. **Dennis inflates the cost of furniture, lighting, and other items.**

27. Throughout Dennis's performance under the contract, the Marcuses requested that Dennis provide copies of the invoices from vendors that Dennis purported to be paying directly from the more than $250,000 entrusted to her care as the Marcuses' agent.

28. But Dennis frequently provided excuses for failing to do so, complaining that it would take too much time, but promising that she had all the invoices in her office and would provide them eventually.

29. In August 2021—under threat of litigation—Dennis finally provided the Marcuses copies of the vendor invoices for furniture, lighting, and other items that Dennis had purchased—or had promised to purchase—for the Marcuses as their agent.

30. A comparison of the underlying invoices to the purported cost reflected in Dennis's then-current spreadsheet showed that Dennis had dramatically inflated the cost of these items before charging them to the Marcuses.

31. But there is nothing in the contract (Ex. A) that states or implies that Dennis would be marking up the underlying expenses from vendors before passing them along to the Marcuses.

32. And nothing in the spreadsheets Dennis provided to the Marcuses stated, implied, or otherwise indicated that Dennis was increasing the cost of the underlying items before passing along the charge to the Marcuses.

33. In fact, Dennis took steps to ensure that the Marcuses remained in the dark about how much these items actually cost.

34. Dennis understood she could not legally inflate these third-party expenses before passing them along to the Marcuses; in the one instance where Dennis realized the Marcuses likely knew the true cost, she charged only and precisely that amount.

35. On September 25, 2020, Neal Thomson of Thomson & Cooke Architects—the Marcuses' architect—received quotes from The Urban Electric Company relating to certain electrical fixtures contemplated for installation in the Marcuses' home. *See* Ex. B.

36. The day after he forwarded that pricing information to Dennis, Dennis asked Thomson not to provide any pricing information to the Marcuses, because it was her preference to present all fixture pricing information herself. *See id.*

37. Around the same time, Thomson spoke by phone with a representative of The Urban Electric Company. During that phone call, the representative informed Thomson that she recently received a phone call from Ms. Dennis, the contents of which are described in the next paragraph. *See id.*

38. During a phone call between Ms. Dennis and a representative of The Urban Electric Company in or around October 1, 2020, Dennis—who sounded upset—instructed the representative not to share any pricing information, or any information about what had been ordered, with anyone associated with the Marcus project other than Ms. Dennis herself. *See id.*

39. On information and belief, Dennis instructed other vendors not to communicate any information about the Marcuses' project with anyone associated with the project—including the Marcuses themselves—other than Dennis herself.

40. Out of roughly two hundred expenses that Dennis ultimately "charged" to the Marcuses, The Urban Electric fixture was one of only two items she did not actually mark-up. (The other was a small package of items from Crate & Barrel.)

41. By contrast, where Dennis believed she could effectively conceal the true cost from the Marcuses, she dramatically overinflated the cost. In doing so, Dennis inflated the cost of these third-party items by seemingly random, inconsistent, and arbitrary amounts, reflecting no rhyme or reason (let alone compliance with a contractual right).

42. For example, Dennis used the funds entrusted to her by the Marcuses to purchase a dining room table that cost $2,878.80. But when she originally charged the Marcuses for that item, she sought $4,750—a markup of 65%.

43. Months later—under threat of litigation—Dennis's attorney asserted that the contract between the parties contemplated an across-the-board mark-up of 20%, and produced a revised spreadsheet that charged $3,455 for that same table—a markup of 20%.

44. Similarly, Dennis used the funds entrusted to her by the Marcuses to purchase artwork that cost $14,000. But when she originally charged the Marcuses for that item, she sought $18,000—a 29% markup.

45. But when her lawyer produced a revised spreadsheet under threat of litigation, she charged $16,800—a 20% markup.

46. This pattern of behavior conclusively demonstrates that Dennis intended to deceive the Marcuses into believing that she was only charging them what the underlying items actually cost, while secretly overinflating the prices—by whatever arbitrary amount she thought she could get away with—and pocketing the difference.

47. When she knew the Marcuses likely had been informed about the items' true price—like with The Urban Electric Company's light fixtures—she charged them the true cost; when she successfully concealed the information from the Marcuses, she overinflated the prices.

**E. After another client hired Dennis to work on a substantially larger project, Dennis's performance suffers; she eventually quits in April 2021.**

48. On or about July 2020, Dennis contracted with other parties to work on a multi-million-dollar project in Middleburg, Virginia.

49. Around that time, Dennis's performance on the Marcus project began to appreciably suffer.

50. For example, Dennis began showing up substantially late to the project team's standing weekly meeting (when they were already over or winding down), or skipping them altogether.

51. Eventually, Dennis led the Marcuses to believe that their new home would be ready for them to move in by April 2021, including furniture, window treatments, et cetera.

52. Although she admitted that some items of furniture might be delayed—often citing delays caused by the ongoing COVID-19 pandemic—Dennis promised that if anything was missing, she would obtain rental furniture the Marcuses could use until their purchased items arrived.

53. To allow Dennis extra time to finish her preparations, the Marcuses stayed in a hotel for several days in Washington, D.C. after returning from a short trip to Florida.

54. But when the Marcuses and their two children (aged 3 and 6) moved into their new home on Saturday, April 10, 2021 they were surprised to find it almost completely empty—virtually nothing Dennis had been paid to procure had arrived. For example, a few items from the Marcuses' old home had been delivered (like a couch and some mattresses), but there was no dining table or chairs, and most of the home's rooms were completely empty.

55. Later that evening, Dennis came over to the Marcuses' home. She brought with her some bar stools for the kitchen, a metal stool for an office area near the kitchen, and an office chair for Mr. Marcus's home office.

56. During that visit, Mrs. Marcus spoke to Dennis for approximately a half an hour to express her disappointment in Dennis's failure to perform her contractual obligations. At the end of that conversation, Dennis promised that by Monday morning (April 12, 2021), Dennis would provide an updated spreadsheet explaining the precise status of each of the items she claimed to have procured for the Marcuses, with detailed information about when they were expected to be delivered.

57. Dennis did not provide an updated spreadsheet on April 12, however, or the next day.

58. During that time, the Marcuses reached out to Dennis by text message, phone, and email, but Dennis did not respond.

59. On the morning of April 14, 2021, Mrs. Marcus emailed Dennis: "Marlene, We moved in 5 days ago and we have not heard from you. I have reached out many times via text, phone, and email. We have a lot of questions and we are still waiting for an installation schedule. In addition, we are missing basic items that should have been here when we moved in (bath accessories, shower curtains, bedding, etc.). If I do not hear from you this morning, we plan to terminate our relationship and finish the project with another designer."

60. Not long afterward, Dennis spoke to Mr. Marcus by phone. During that call, Dennis stated that she would not be performing under the contract, and accordingly, thought it would be best for the Marcuses to hire another designer to complete the tasks that Dennis had already been paid to perform.

61. Around this same time, contrary to explicit instructions from the Marcuses, Dennis arbitrarily claimed that she "canceled" a number of items that the Marcuses and Dennis had spent a number of hours selecting and (supposedly) ordering. Those items include, for example, drapery and drapery hardware for the entire house, a rug for the children's play room, cushions and pillows for two rooms, and an office desk chair for Jaime's office.

62. As a result of Dennis's decision to cancel the orders for these items contrary to the Marcuses's explicit instructions—if she ever actually ordered them in the first place—completion of the job remained substantially delayed. For example, Dennis had promised that all of the window treatments (including drapery and drapery hardware) would be installed by the time the

Marcuses moved into their home in early April 2021, but as a result of Dennis's arbitrary actions, the drapery will not be installed until mid-September 2021.

63. In light of Dennis's refusal to complete the project, the Marcuses hired another design team to complete it.

64. To date, they have already paid $85,114.50 to the new designers for their time to finish the work that Dennis had been hired—and paid—to perform under the original contract, and the work is still not complete.

## Count I: Breach of Contract
### (Against Marlene Dennis Design)

65. The Marcuses re-allege and incorporate the prior paragraphs of this Complaint as if fully set forth herein.

66. The parties executed a contract, attached as Exhibit A, in October 2018.

67. The Marcuses performed all of their contractual obligations: they paid Dennis over $100,000 for her hourly services; entrusted Dennis with over $50,000 more than the cost of procuring furniture, lighting, and other items; and worked together in good faith with Dennis to enable Dennis to perform her contractual obligations.

68. Dennis, however, materially breached the contract in several ways.

69. First, Dennis materially failed to complete the tasks she had been paid to perform. For example, Dennis failed to timely order items she agreed to order, and then misled the Marcuses into believing she had done so. By the time the Marcuses moved into the home in April 2021, virtually none of the furniture had been delivered as promised.

70. As a direct and proximate result of Dennis's repeated and material failures to perform, the project's completion was delayed by at least several months—it still is not complete—

and required the Marcuses to pay $85,114.50 (and counting) to another designer to complete the tasks that Dennis had been paid to perform.

71. Second, Dennis charged the Marcuses at least $20,000 more than permitted under the contract for her services at an hourly rate, much of which the Marcuses paid. *See* Ex. A, 2 (Dennis's compensation should not "exceed $50,000 for design consultation and $50,000 for furniture selection and procurement.").

72. As a direct and proximate result of Dennis's breaches, the Marcuses paid at least $20,000 more in Contract Fees than they were obligated to pay.

73. Finally—stated as an alternative to Count Two—the contract (as later amended) created a fiduciary relationship whereby Dennis (as agent) would use funds entrusted to her care by the Marcuses (as principals) to purchase furniture, fixtures, lighting, and other items.

74. Dennis breached this obligation by concealing from the Marcuses the true cost of the items, instructing others to conceal this information from the Marcuses, and then keeping for herself more than $50,000 in excess of the actual cost of those items without revealing to the Marcuses that she had done so. This conduct also breached the contract's express limitation that compensation would not exceed $50,000 for "furniture selection and procurement."

75. As a direct and proximate result of these breaches, the plaintiffs were harmed in an amount exceeding $75,000.00.

## Prayer for Relief (Count I)

76. The Marcuses respectfully request that the Court enter judgment in their favor and against Marlene Dennis Designs and award:

    a. At least $75,000 in compensatory damages, in an amount to be determined by the jury;

b.     Attorneys' fees and costs;

c.     Pre- and post-judgment interest, as appropriate; and

d.     Any other relief the Court deems fair and just.

### Count II: Breach of Fiduciary Duty
### (Against Both Defendants)

77.    The Marcuses re-allege and incorporate the prior paragraphs of this Complaint as if fully set forth herein.

78.    In November 2020, Dennis asked the Marcuses to entrust more than $250,000 to her care, so that she (as agent) could procure items from third parties on their behalf (as principal).

79.    When the Marcuses entrusted these funds to her care, this created a fiduciary relationship between Dennis and the Marcuses.

80.    Dennis breached her fiduciary duties by representing to the Marcuses that the items she purchased on their behalf cost over $50,000 more than they actually did—while concealing the true cost from the Marcuses and taking steps to prevent third parties from disclosing that information—and pocketing the difference for herself.

81.    In doing so, Dennis acted intentionally, willfully, wantonly, and with malice, knowing that the Marcuses would not authorize her to keep the extra money if they knew the true cost of the items being procured by Dennis on the Marcuses' behalf.

82.    As a direct and proximate result of these breaches, the Marcuses suffered damages in excess of $50,000 in overcharges.

83.    To the extent this fiduciary relationship arose by common law—and not by contract—Dennis's conduct amounts to fraud and justifies the imposition of punitive damages.

Prayer for Relief (Count II)

84.    The Marcuses respectfully request that the Court enter judgment in their favor and

jointly and severally against each Defendant identified in this Count and award:

    a.    At least $50,000 in compensatory damages, in an amount to be determined by the jury;

    b.    Punitive damages in an amount to be determined by the jury;

    c.    Attorneys' fees and costs;

    d.    Pre- and post-judgment interest, as appropriate; and

    e.    Any other relief the Court deems fair and just.

**Count III: Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196 *et seq.*
(Against Both Defendants)**

85. The Marcuses re-allege and incorporate the prior paragraphs of this Complaint as if fully set forth herein.

86. Marlene Dennis is a supplier as defined by Va. Code § 59.1-198. She is a professional interior designer who regularly engages in consumer transactions by offering her services (and the procurement of goods) to be used primarily for personal, family, or household purposes.

87. Marlene Dennis Design, LLC is a supplier as defined by Va. Code § 59.1-198. It, through the services of its principal Marlene Dennis, regularly engages in consumer transactions by offering Ms. Dennis's professional services (and the procurement of goods) to be used primarily for personal, family, or household purposes.

88. The services that Defendants were hired to perform under the contract were intended to be used primarily for personal, family, and household purposes.

89. The conduct described above repeatedly violated Va. Code § 59.1-200(A)(14) by using fraud, false pretense, false promise, and misrepresentations in connection with a consumer transaction.

90. Specifically, despite the contract's assertion that Dennis's "compensate[ion]" was "not to exceed . . . $50,000 for furniture selection and procurement," Dennis secretly compensated herself more than $50,000 to which she was not entitled (in addition to the $50,000 already obtained) by marking up nearly every item she obtained from third parties using funds entrusted to her by at least 20%, concealing the true cost from the Marcuses, taking steps to prevent third parties (vendors, the architects, et cetera) from revealing that information to the Marcuses, and providing the Marcuses with a spreadsheet that affirmatively stated the cost of each item without disclosing that the cost of virtually every item had been overinflated by at least 20%.

Prayer for Relief (Count III)

91. The Marcuses respectfully request that the Court enter judgment in their favor and jointly and severally against each Defendant identified in this Count and award:

    a.    At least $50,000 in compensatory damages, in an amount to be determined by the jury;

    b.    Treble damages pursuant to Va. Code § 59.1-204;

    c.    Attorneys' fees and costs according to Va. Code § 59.1-204 (and other law, if applicable);

    d.    Pre- and post-judgment interest, as appropriate; and

    e.    Any other relief the Court deems fair and just.

### Count IV: Piercing the Corporate Veil
### (Against Marlene Dennis via Marlene Dennis Designs)

92. The Marcuses re-allege and incorporate the prior paragraphs of this Complaint as if fully set forth herein.

93. On information and belief, Marlene Dennis is the sole owner of Marlene Dennis Designs, and in exclusive control of its operations.

94. Also on information and belief, Marlene Dennis keeps Marlene Dennis Designs insufficiently capitalized to meet its obligations, siphoning off its funds—including the funds she is holding for the Marcuses and other clients as a fiduciary—for her personal benefit.

95. Although Marlene Dennis does use the name of the entity (Marlene Dennis Designs) in her contracts, she conducts all of her business through a personal email address (marlenedennis@comcast.net) rather than through a company email address.

96. On information and belief, Dennis also conducts all of her personal, non-business activities through that same email account.

97. Also on information and belief Marlene Dennis Designs has no employees, and all of the services performed by Marlene Dennis Designs are actually performed personally by Marlene Dennis herself.

98. In particular, with regard to the scheme to overinflate expenses to siphon money from the funds entrusted to Dennis's care (described in Counts I, II, and III), Dennis used Marlene Dennis Designs as her alter ego, alias, stooge, or dummy, as a device of sham used to disguise wrongs, and obscure fraud.

<u>Prayer for Relief (Count IV)</u>

99. The Marcuses respectfully request that the Court enter judgment in their favor and hold Marlene Dennis personally liable for any judgment against Marlene Dennis Designs for Counts I, II, or III.

**Jury Demand**

The Marcuses demand a trial by jury.

Respectfully submitted,

<u>/s/ Timothy R. Clinton</u>
Timothy R. Clinton (Va. Bar No. 70902)
Clinton & Peed
1775 Eye Street NW, Suite 1150
Washington, DC  20006
Tel: (202) 919-9491
Fax: (202) 919-9454
tim@clintonpeed.com

*Attorney for Plaintiffs Greg and Jaime Marcus*

Dated: September 24, 2021