IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GREGORY H. MARCUS, *et al.*,            )
                                         )
        Plaintiffs,                      )
                                         )
v.                                       )        Civil Action No. 1:21-cv-01085 (RDA/TCB)
                                         )
MARLENE DENNIS, *et al.*,               )
                                         )
        Defendants.                      )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the Defendants Marlene Dennis ("Dennis") and Marlene Dennis Design, LLC's ("MDD") Motion to Dismiss for Failure to State a Claim (Dkt. 9). The Court dispenses with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). The Motion is now fully briefed and ripe for disposition. Considering the Motion together with Defendants' Memorandum in Support (Dkt. 10), Plaintiffs' Opposition (Dkt. 14), Defendants' Reply (Dkt. 17), Defendants' supplemental choice-of-law brief (Dkt. 19), and Plaintiff's supplemental choice-of-law brief (Dkt. 20), the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss for Failure to State a Claim for the reasons that follow.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiffs Gregory H. Marcus and Jaime N. Marcus ("Plaintiffs") filed a Complaint against Defendants alleging four counts: (1) breach of contract solely against MDD; (2) breach

---

[1] For purposes of considering the Motions, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

of fiduciary duty; (3) violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.*; and (4) piercing the corporate veil against Dennis via MDD.

Plaintiffs are married and reside together in Bethesda, Maryland. Dennis is a professional interior designer who resides in and operates MDD out of The Plains, Virginia. On October 15, 2018, Plaintiffs and MDD entered into a contract for design services, incorporated into the Complaint as an exhibit, for the purpose of constructing and furnishing a new home in Bethesda, Maryland. According to the contract, Dennis would act as the "Designer" of Plaintiffs' new home in "arrang[ing] and oversee[ing] the procurement and installation" of "flooring, wall coverings, finishes, furniture, and fixtures" after establishing a design concept. Dkt. 1 ¶ 12. Once Plaintiffs approved of the "Conceptual Design," Dennis and MDD would then "coordinate with Thomson & Cooke [Architects]" and Plaintiffs' builder in designing the space. Dkt. 1-1 at 2. Per the contract:

> [Plaintiffs] agree[] to compensate Designer $175 per hour, not to exceed $50,000, for design consultation and $50,000 for furniture selection and procurement. Designer will invoice client monthly. Furniture invoices will be saved in an orderly manner, tied to the furniture spreadsheet and placed in a shared drop box . . . . [Plaintiffs] will be invoiced monthly for expenses directly related to [Plaintiffs'] Project. Such expenses may include, but are not limited to: courier, express delivery, postage, and storage of any items that cannot be delivered due to construction. Furnishings, rugs, artwork, decorative lighting and accessories not to exceed $250,000. Assumes [Plaintiffs] will use and/or re-purpose much of what they currently own. Designer and [Plaintiffs] to review Furniture Plan and agree on the items to be repurposed and to confirm that $250,000 is an appropriate amount given the items required.

*Id.* at 2-3.

In July of 2020, Dennis allegedly began work on a multimillion-dollar project, which precipitated a decline in Dennis' performance on Plaintiffs' project. Dennis allegedly exhibited dilatory behavior and she did not perform consistent with previously agreed-upon target dates.

In November of 2020, more than two years after the contract had been signed, Dennis allegedly sent Plaintiffs an invoice reflecting her charges from July 15, 2019 through November 2, 2020, which, at the contractually agreed-upon rate of $175 per hour, totaled nearly $68,000. Dennis informed Plaintiffs that after paying that invoice, the total "Contract Fees" would exceed the $100,000 Designer consulting fee cap imposed in the original agreement.  Dkt. 1 ¶ 16; Dkt. 1-1 at 2.  Plaintiffs nevertheless paid the invoice, in addition to other invoices, allegedly amounting to $124,722.41.  Dkt. 1 ¶¶ 18-19.

In January of 2021, Dennis allegedly invoiced the Plaintiffs for an additional $255,560.72 for the materials purchased to facilitate the design plan.  *Id.* ¶ 21.  Dennis then successfully convinced Plaintiffs to wire her $255,000 in order to expedite the furniture order and delivery process rather than pay the vendors directly.  Despite Plaintiffs' repeated requests that Dennis provide copies of the invoices from vendors for these materials, Dennis allegedly dodged the requests.  But when Plaintiffs threatened litigation in August of 2021, Dennis allegedly provided copies of the vendor invoices.  After examining these documents, Plaintiffs realized Dennis had "dramatically inflated the cost of these items before charging them" to Plaintiffs in order to allegedly collect the surplusage for her personal gain.  *Id.* ¶¶ 30, 32.

On September 25, 2020, Neal Thomson, Plaintiffs' architect, allegedly received quotes from The Urban Electric Company for certain electrical fixtures to be installed in Plaintiffs' new home.  Dkt. 1-2 ¶ 3.  On September 30, 2020, Thomson provided that pricing information to Dennis, and on October 1, 2020, Dennis allegedly asked Thomson to withhold any of the pricing information from Plaintiffs.  *Id.*  ¶¶ 4-5.  In a subsequent phone call between Dennis and The Urban Electric Company, Dennis also allegedly "instructed the representative not to share any pricing information, or any information about what had been ordered, with anyone associated

3

with the [] project other than Dennis herself." Dkt. 1 ¶ 38; Dkt. 1-2 ¶ 6.  Plaintiffs further allege

that Dennis conveyed the same concerns to other vendors.  Of the roughly two hundred expenses

Dennis listed for Plaintiffs' review, The Urban Electric fixture was allegedly one of two items

she "did not actually mark-up."  *Id.* ¶ 40.  But for other items for which Dennis could hide the

actual price, she allegedly "dramatically overinflated the cost."  *Id.* ¶¶ 41, 47.  For instance, she

allegedly purchased a dining table for $2,878.80 but charged Plaintiffs $4,750—before reducing

it to $3,455 "under the threat of litigation"—and a $14,000 piece of artwork but charged

Plaintiffs $18,000—before reducing it to $16,800 "under threat of litigation."  *Id.* ¶¶ 42-45.

Moreover, Plaintiffs allege that when they moved into their new home on April 10, 2021,

it was "almost completely empty."  *Id.* ¶¶ 51-54.  That evening, Dennis allegedly visited the

home and promised Plaintiffs that she would provide a revised spreadsheet outlining the status

of all pieces of furniture in delay by the morning of April 12, 2021.  *Id.* ¶ 56.  But Dennis

allegedly never followed through and went silent despite Plaintiffs' best efforts to connect.  *Id.*

¶ 57-58.

On April 14, 2021, Plaintiff Jaime Marcus allegedly emailed Dennis:

Marlene, We moved in 5 days ago and we have not heard from you. I have reached
out many times via text, phone, and email. We have a lot of questions and we are
still waiting for an installation schedule. In addition, we are missing basic items
that should have been here when we moved in (bath accessories, shower curtains,
bedding, etc.). If I do not hear from you this morning, we plan to terminate our
relationship and finish the project with another designer.

*Id.* ¶ 59.  This email prompted Dennis to call and allegedly state that she would not be performing

under the contract and that Plaintiffs should look elsewhere.  *Id.* ¶ 60.  Moreover, Dennis had

allegedly informed them that she had cancelled numerous previously agreed-upon orders, which

further "substantially delayed" the project.  *Id.* ¶¶ 61-62.  Plaintiffs then hired another design

team and at the time of filing the Complaint, had allegedly paid them $85,114.50 "to finish the

work that Dennis had been hired—and paid—to perform under the original contract."  *Id.* ¶ 64.
The work remains unfinished.

## B.  Procedural Background

On September 24, 2021, Plaintiffs filed their Complaint with the contract in question and
a declaration of Neal Thomson as attachments.  Dkt. 1.  Defendants then filed the instant Motion
with an accompanying written brief on November 5, 2021 after obtaining leave of Court to
extend the time to file an answer to the Complaint.  Dkt. Nos. 7-10.  Plaintiffs filed their
Opposition on November 19, 2021.  Dkt. 14.  And after the Court granted Defendants' motion
for a filing extension, Defendants filed their Reply on December 1, 2021.  Dkt. 17.  On March
30, 2022, this Court ordered supplemental briefing on the contract and tort claims.  Both parties
filed their briefs on April 15, 2022.  Dkt. Nos. 19; 20.

## II.  STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint.  *Brockington v. Boykins*, 637
F.3d 503, 506 (4th Cir. 2011).  "[T]he reviewing court must determine whether the complaint
alleges sufficient facts 'to raise a right to relief above the speculative level[,]'" and dismissal of
the motion is appropriate only if the well-pleaded facts in the complaint "state a claim that is
plausible on its face."  *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th
Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  A claim is
facially plausible "when the plaintiff pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a plaintiff need only "allege facts sufficient to state all
the elements of her claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir.

2003), and "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff].'" *Dao v. Faustin*, 402 F. Supp. 3d 308, 315 (E.D. Va. 2019) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015)). Still, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). And "[g]enerally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb*, 791 F.3d at 508).

## III.  ANALYSIS

### A.  Count I – Breach of Contract Claim

Defendants argue that the multiple bases for breach of contract claimed by Plaintiffs are unenforceable. First, they submit that there can be no claim for breach based on delays because the contract fails to outline any deadlines to complete the project. As to the enforcement of the $100,000 cap on hourly fees paid to MDD, Defendants maintain as an affirmative defense that Plaintiffs waived their right to enforce that cap when they knowingly payed MDD's invoices above the capped amount rather than seeking termination for breach. And because the contract is silent on the issue of markups, Defendants argue that Plaintiffs have no basis for asserting a breach of contract.

Plaintiffs argue in turn that the contract provides unambiguous compensation limits tied to a concrete hourly rate and that the contract's silence on MDD's ability to mark up expenses

does not, by itself, authorize such conduct.  Moreover, Plaintiffs maintain that because they were unaware of Dennis' price markup, they could not have knowingly waived the compensation cap.

The Court must first review the applicable law of the forum in which the claim arises.  It is a fundamental principle that a federal court presiding over a case with jurisdiction via the diversity statute, as here, is obliged to apply the substantive law directed by the forum's choice-of-law rules.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Virginia's choice-of-law rules apply the *lex loci contractus* rule whereby the law of the state where the contract was formed governs.  *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423 (1970).  The place of contracting "is determined by the place where the final act necessary to make the contract binding occurs."  *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).  Here, the parties agree that the place of contracting was Virginia.  Dkt. 19 at 2-3; Dkt. 20 at 2.  Absent evidence to the contrary, this Court agrees and finds that Virginia principles of contract interpretation apply.

Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Vlaming v. West Point Sch. Bd.*, 10 F.4th 300, 307 (4th Cir. 2021) (quoting *Filak v. George*, 267 Va. 612, 618 (2004)).  Contractual obligations may only be waived when a party has "knowledge of the facts basic to the exercise of the right and intent to relinquish that right."  *Va. Polytechnic Inst. and State Univ. v. Interactive Return Servs., Inc.*, 267 Va. 642, 651-52 (2004) (quoting *Emp'rs. Com. Union Ins. Co. of Am. v. Great Am. Ins. Co.*, 214 Va. 410, 412-13 (1973)).

Taking Plaintiffs' allegations as true, Plaintiffs have pleaded a plausible breach of contract claim.  This Court considers *Johnson v. Robert Shields Interiors, Inc.*, No. 1:15-cv-820,

2016 WL 2739270 (E.D. Va. May 11, 2016) instructive.[2]  In *Johnson*, the defendant overcharged the plaintiff on an agreed budget of $250,000 for an interior design project similar to the one in this matter.  *Id.* at *4-5.  There, the defendant left many of the rooms unfurnished, overcharged plaintiff for its design and procurement services, and up-charged the plaintiff for the costs of furniture without plaintiff's knowledge.  *Id.* at *5-6.  While the agreement in that case provided that the defendant was entitled to a 10% markup on shipping and related services, the Court found breach because the agreement "did not provide for any other markups, commissions, or fees" such that the "defendant's undisclosed markups on items procured for plaintiff" violated the agreement.  *Id.* at *6.

Here, MDD agreed with Plaintiffs to a compensation structure by which Dennis would receive hourly compensation for her services at a rate of $175 per hour up to a total of $50,000 for design consultation and up to $50,000 for furniture selection and procurement and expenses related to the project would be capped at $250,000.  Although Plaintiffs alleged that MDD invoiced Plaintiffs for $124,722.41, resulting in an overcharge of more than $20,000, Dkt. 1 ¶¶ 18-19, 71, Dennis informed Plaintiffs that the total "Contract Fees" "would exceed the contractual cap of $100,000."  *Id.* ¶ 16.  Yet Plaintiffs still paid Dennis *in spite of their knowledge* that they were paying Dennis more than she was contractually entitled.  By that allegation, Defendants' affirmative defense carries weight—Plaintiffs plausibly "intentional[ly] relinquish[ed] [] a known right."  *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 74 (1983).

---

[2] Defendants cite to *Comstock Potomac Yard, L.C. v. Balfour Beatty Constr., LLC*, No. 1:08-cv-894, 2009 WL 1076752 (E.D. Va. Apr. 20, 2009) and *McDaniel v. Griffith*, No. 0597-15-3, 2016 WL 1425436 (Ct. App. Va. Apr. 12, 2016).  But neither of these cases cut against this Court's view that Plaintiffs agreed to pay Defendants according to a clear-cut cap on fees and expenses and that nothing in the contract permitted Defendants to up-charge on expenses.

That said, MDD neglected to follow the contract's requirements to provide Plaintiffs with monthly invoices of those Designer fees. The same is true for the furniture and design expenses charged to Plaintiffs. *Id.* ¶ 21. Equally problematic, Dennis—in identical fashion to the designer in *Johnson*—inflated the expenses on the items she ordered from the third-party vendors when invoicing plaintiffs. If true, that surreptitious behavior constitutes the exact "undisclosed markups on items procured for" Plaintiffs that the Court considered a breach in *Johnson*. This logic makes sense because Plaintiffs were paying Dennis $255,000 solely for the costs of the furniture. Permitting Dennis to double dip under the terms of the contract would gut the entire purpose of bifurcating "Contract Fees" and "Project Expenses." Insofar as Dennis was inflating the expenses, as Plaintiffs have specifically alleged, Plaintiffs were without knowledge of Dennis' practice, unlike with her Contract Fees. It follows that Plaintiffs paid $255,000 in expenses to Dennis without the requisite intention to relinquish their contractual right to ensure that those expenses were just that—expenses—and not count toward the Contract Fees envisaged by the contract. Therefore, at the motion-to-dismiss stage, there is no waiver on *this* alleged breach of contract.

Beyond the *Johnson* line of analysis, Dennis' alleged conduct, as an agent of MDD, also violates the implied duty of good faith and fair dealing to which parties are held under Virginia law. *See Stoney Glen, LLC v. S. Bank and Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013) ("The duty [good faith and fair dealing] can also be breached if the purported exercise of a contractual right is dishonest, as opposed to merely arbitrary."); *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (allowing a breach of contract claim to proceed because the complaint alleged that the defendant's actions "were not merely unfavorable, but dishonest."); *but see Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 251 Va. 28, 35 (1996)

(rejecting a breach of the duty of good faith when the defendant's conduct was "arbitrary, but it was not dishonest"). "[A] breach of the duty of good faith constitutes a breach of contract." *JTH Tax*, *Inc. v. Aime*, 984 F.3d 284, 294 (4th Cir. 2021) (citing *Brauer Co.*, 251 Va. at 35).

Dennis' alleged behavior far surpassed the arbitrary and creeped waywardly into the dishonest. *See, e.g.*, Dkt. 1 ¶¶ 28, 33 ("Dennis took steps to ensure that the [Plaintiffs] remained in the dark" about the true cost of the items she purchased from vendors); *id.* ¶ 34 (but when Dennis realized the Plaintiffs "likely knew the true cost," of an item, Dennis "charged only and precisely that amount"). Plaintiffs have pleaded another basis to anchor their breach of contract claim.

As a result of the alleged breaches of the contract, Plaintiffs overpaid Dennis for the expenses. And when Dennis alerted Plaintiffs that she would not be performing on the contract, *id.* ¶ 60,[3] Plaintiffs were forced to hire another design team and spend significant sums addressing Defendants' inability to complete the job as outlined per the contract. Accordingly, Plaintiffs have pleaded a facially plausible breach of contract claim under Virginia law.

## B. Count II – Breach of Fiduciary Duty Claim

Plaintiffs bring a breach of fiduciary tort claim against both defendants, arguing that when Dennis asked Plaintiffs to entrust her with more than $250,000 to procure items from third-party vendors for the project, Dennis acted as Plaintiff's agent. Dkt. 1 ¶¶ 77-84. As their agent, Dennis is alleged to have concealed the true cost by withholding that information from Plaintiffs

---

[3] Based on the allegations in the Complaint, Plaintiffs did not repudiate the contract prior to Dennis providing notice that she would not be performing. While Plaintiffs allegedly alerted Dennis over email, following her alleged unresponsiveness, that they "plan to terminate [their] relationship and finish the project with another designer" if they "d[id] not hear from [her] th[at] morning," *id.* ¶ 59, such a statement was not a "clear, absolute, [and] unequivocal" notice of termination under Virginia law. *Vahabzadeh v. Mooney*, 241 Va. 47, 51 (1991) (citing *Link v. Weizenbaum*, 229 Va. 201, 203 (1985); *Simpson v. Scott*, 189 Va. 392, 400 (1949)).

and further taking steps to prevent the disclosure of that information by the vendors to the Plaintiffs—allowing her to retain the difference for her personal gain. *Id.* ¶¶ 78, 80. Plaintiffs argue that the Complaint alleges each of the required elements to assert a breach of fiduciary duty claim. Dkt. 14 at 8.

Defendants argue that the source-of-duty rule prevents extracting a tort claim from the contract claim. Dkt. 10 at 12-14. And to the extent Plaintiffs raise the fiduciary breach claim against Dennis individually, Defendants argue that because Dennis was not a party to the contract, the only cognizable common law duty would be against MDD. *Id.* at 14 n.6.

Applying Virginia choice-of-law principles to Plaintiffs' breach of fiduciary duty tort claim, this Court first considers "the occurrence of the plaintiff's injury." *See Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*, 533 F. App'x 200, 206 (4th Cir. 2013). While the economic effect of Plaintiffs' injury was felt at their residence in Maryland, for purposes of choice-of-law, the occurrence of Plaintiffs' injury "occurs at the point of the wrongful act, not where the economic impact ultimately accrues." *Id.* (citing *Milton v. IIT Research Inst.*, 138 F.3d 519, 522 (4th Cir. 1998)). While Plaintiffs allege that some of the events giving rise to Defendant's alleged breach of fiduciary duty occurred in Maryland, such occurrences were "*de minimis*" and instead the "substantial part" "of the events and omissions giving rise to the claim occurred in the Commonwealth of Virginia." Dkt. 1 ¶ 9; Dkt. 20 at 1-2. Defendants agree that Virginia law should apply. Seeing that Dennis lived in and operated her business out of Virginia, it is likely that the allegations involving her breach of fiduciary duty and the attendant misrepresentations of her fulfillment of the parties' contract occurred there as well. As such, this Court applies Virginia law to Plaintiffs' tort claim.

For state law tort claims in Virginia, whether there can be an actionable breach of fiduciary duty claim against a defendant depends on whether a "legal duty, a violation of the duty, and a consequent injury" exist. *Gray v. Inova Health Care Servs.*, 257 Va. 597, 599 (1999); *see also Jeld-Wen, Inc. v. Gamble*, 256 Va. 144, 147 (1998) ("Without a legal duty there can be no cause of action for an injury."). The question of "whether a legal duty in tort exists is a pure question of law." *Kellermann v. McDonough*, 278 Va. 478, 487 (2009). "A tort may be described as a wrong independent of contract, for which the appropriate remedy is a common law action." *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 81 (2019) (quoting J.F. Clerk & W.H.B. Lindsell, The law of Torts 1 (1889)); *see also id.* ("A tort, then, is any wrong not consisting in mere breach of contract, for which the law undertakes to give to the injured party some appropriate remedy against the wrong-doer.") (quoting Thomas M. Cooley, The Elements of Torts 2 (1895)). Courts must therefore determine "whether a cause of action sounds in tort, contract, or both" which requires ascertaining the "source of the duty violated." *Tingler*, 298 Va. at 81 (quoting *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 458 (2017)).

The Virginia source-of-duty provides that "[i]f . . . the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort." *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 558 (1998). "Framed this way, the source-of-duty rule attempts to mark off the boundaries of civil liability and to protect our jurisprudence from the modern trend that is intent on 'turning every breach of contract into a tort.'" *Tingler*, 298 Va. at 82-83 (quoting *MCR Fed., LLC*, 294 Va. at 458).

It is true that Virginia courts have allowed plaintiffs to rebut the source-of-duty rule in the context of certain special relationships established between the parties. However, this Court

is unaware of any instances in which a general principal-agent relationship has withstood that test and survived the merging of a tort claim into the contract claim.  *See Tingler*, 298 Va. at 82 n.11 (collecting cases and describing special relationships involving common carriers and innkeepers and their guests as examples of when "a single act or occurrence can support causes of action for both breach of contract and for breach of a duty arising in tort." (quoting *MCR Fed., LLC,* 294 Va. at 457-58)); *see also A.H. ex rel. C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 620-23 (2019) (describing special relationships between a business owner and an invitee, an employer and an employee, and between "a vulnerable individual in a custodial relationship and his or her custodian").  Rather, breach of fiduciary duty claims have been dismissed when those duties arise only because of an agreement between the parties involved.  *See, e.g.*, *Johnson v. Bella Gravida, LLC*, 105 Va. Cir. 350, 356 (2020); *see also Augusta Mut. Ins. Co. v. Mason*, 274 Va. 199, 205 (2007) (applying the rule that "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of contract" to a breach of fiduciary duty claim).

To be clear, this Court recognizes that Plaintiffs' entrustment of funds to MDD, and Dennis as an agent of MDD, was extracontractual.  But the source-of-duty rule's parameters do not end simply because the parties agreed to amend a particular term of the contract over the course of performance to impose a fiduciary relationship between the parties.  That amendment would not have arisen without the parties having negotiated the agreed-upon contract in the first instance.  Contrary to Plaintiffs' position, Dkt. 1 ¶ 83, the fiduciary relationship arose by contract and not by common law.

Plaintiffs stage their breach of fiduciary duty claim on alleged fraud and concealment by Dennis.  Dkt. 1 ¶¶ 1, 41, 47, 74, 80, 83, 90.  Instances involving actual and constructive fraud,

which arise solely out of a contractual relationship, "may be barred by the source-of-duty rule when the damages arise solely out of the underlying contractual relationship." *Tingler*, 298 Va. at 82 n.11 (citing *Richmond Metro. Auth.*, 256 Va. at 560). Whereas allegations of fraudulent inducement "logically preexist before the contract allegedly induced and thus stand as a viable tort claim." *Id.*; *see Abi-Naim v. Concord Condo., LLC*, 280 Va. 350, 363-64 (2010) (rejecting the view that fraudulent inducement can find its source in contract because it occurred "before a contract between the two parties came into existence."); *Filak*, 267 Va. at 618-19 (rejecting a constructive fraud claim because the assumed duties "arose solely from the parties' alleged oral contract"). Here, Dennis' alleged fraudulent concealment of the true prices of certain project materials occurred *after* the parties contracted and therefore cannot be construed as fraudulent inducement. And because the damages derivative of the alleged breach of fiduciary duty related to overpaying Dennis beyond what the contract contemplated, those damages arise solely out of the underlying contractual relationship.

Accepting each of Plaintiff's allegations as true in the Complaint and assessing Virginia law, this Court cannot find as a matter of law that Defendants owed any common law duty to Plaintiff. The source of MDD's duty, and any duty arising to Dennis as an agent of MDD, arises entirely from the contract. *See Tingler*, 298 Va. at 92 (finding no independent ground of tort liability where the claims alleging personal injury were "caused by conditions created during the [contracted-for responsibility]"); *see also KC Trans., Inc. v. LM Ins. Corp.*, No. 2:18-cv-00005, 2021 WL 261277, at *5 (S.D.W. Va. Jan. 26, 2021) (applying the *Tingler* rubric and finding that defendant's "alleged duty . . . is not a duty that arises from the relationship between the parties, regardless of a contract."). Only where the duty arising from the relationship between Plaintiffs and Defendants would have arisen "irrespective of the contract," may the action sound in tort.

14

*Richmond Metro. Auth.*, 256 Va. at 558 (quoting *Oleyar v. Kerr Trust*, 217 Va. 88, 90 (1976)). But for the contract, Plaintiffs would have no relationship with Defendants, and the alleged breach of fiduciary duty is therefore "'entwined with a breach of the contract' and do[es] not reasonably fall 'outside of the contract relationship.'" *Tingler*, 298 Va. at 92-93 (quoting *Dunn Constr. Co.*, 278 Va. at 268).

Thus, because Plaintiffs' breach of fiduciary duty claim arises solely from the contract among Defendants, Count II of the Complaint fails to state a facially plausible claim separate and apart from Count I.

### C.  Count III – VCPA Claim

Plaintiffs further allege that Defendants meet the supplier definition under Va. Code § 59.1-198 and that Dennis' conduct repeatedly violated Va. Code § 59.1-200(A)(14) of the VCPA by "using fraud, false pretense, false promise, and misrepresentations in connection with a consumer transaction." Dkt. 1 ¶ 89.  But Defendants argue that Dennis does not meet the supplier definition and that the allegations against MDD fail due to insufficient particularity because "[t]hey merely assert that there were numerous items for which [Plaintiffs] were overcharged" without specifying "those items or the amounts by which they were overcharged."  Dkt. 10 at 15.  According to Defendants, Plaintiffs' allegations also reveal that they were on notice of the possibility that Defendants "would not track the prices that the vendor themselves were charging" and yet Plaintiffs elected to continue to do business with Dennis despite not receiving the monthly invoices to which they were contractually entitled.  *Id.* at 16.  Lastly, Defendants seek dismissal because the "catch-all" provision of the VCPA on which Plaintiffs rely has, according to Defendants, not been held by Virginia courts to create a statutory duty independent of the duties contained in the disputed agreement.  *Id.* at 17 n.7.

Plaintiffs contend that because Dennis' entrustment of Plaintiffs funds went beyond the terms of the contract, Dennis' alleged conduct may be assessed in her individual capacity under the VCPA.  Citing to the Court's holding in *Johnson*, Plaintiffs argue that the defendant in that case is similarly situated to the defendants in this action and therefore a plausible claim under the VCPA has been pleaded.  While Defendants argue that Plaintiffs were well-aware of the risk that Defendants would charge more than the true cost of the item, it was not unreasonable for Plaintiffs to assume, initially, that Dennis was not lying to them.  Dkt. 14 at 21.  As to Defendants' source-of-duty rule argument, Plaintiffs read Virginia case law to adopt a statutory duty prohibiting any conduct enumerated by the VCPA, in addition to any duties arising in contract.

The VCPA was enacted "to promote fair and ethical standards of dealings between suppliers and the consuming public."  Va. Code § 59.1-197.  "Supplier" is defined in relevant part as "a seller, lessor or licensor who advertises, solicits or engages in consumer transactions." *Id.* § 59.1-198.  The Code provides a litany of prohibited "fraudulent acts or practices committed by a supplier in connection with a consumer transaction."  *Id.* § 59.1-200(A).  Among those practices are specific forms of misrepresentation related to the provision of goods or services, including "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  *Id.* § 59.1-200(A)(14).  "Consumer transaction" is defined as "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes."  *Id.* § 59.1-198. Like other claims of fraud, Virginia courts hold those pleading VCPA claims to a higher pleading standard whereby the complaint must include the identification of "the agents, officers and employees of the entities who are alleged to have perpetrated the fraud and the details of time

and place of the fraudulent acts." *Weiss v. Cassidy Dev. Corp.*, 61 Va. Cir. 237, 244 (2003) (citing *Lambert v. Downtown Garage, Inc.*, 262 Va. 707, 711 (2001)); *Tuscarora, Inc. v. B.V.A. Credit Corp.*, 218 Va. 849, 858 (1978)).  Moreover, the allegation "must be of existing fact, not merely an opinion or an unfulfilled promise or statement to future events."  *Kerlavage v. America's Home Place, Inc.*, No. CL16-1181, 2019 WL 4040617, at *3 (Va. Cir. Ct. Mar. 11, 2019).

This Court first addresses the preliminary question of whether Plaintiffs' VCPA allegation may be brought against both MDD and Dennis.  Virginia law prohibits shoehorning agents of a supplier into the "supplier" definition.  *See Bondurant v. Marscheider Props., LLC*, No. CL16-532, 2016 WL 11575155, at *3 (Va. Cir. Ct. Sept. 30, 2016) (finding no cause of action against a member of an LLC because the property was sold by the LLC, not the member).  In so holding, the *Bondurant* court observed that "[t]he unambiguous language of the statute defines the supplier as the seller."  *Id.*  Here, only MDD signed the contract with Plaintiffs to provide the design services they had agreed upon.  Indeed, Dennis was never named as the "Designer" in the agreement.  The Court's determination in *Johnson* does not contradict this Court's finding because the interior design company in that case was the only named defendant.  While MDD agreed to provide the services that gave rise to the subject of this dispute, Virginia law disqualifies Plaintiffs from bringing a cause of action against Dennis in her capacity as agent of MDD.  Given Dennis' extracontractual entrustment of Plaintiffs' monies arose only because of the aforementioned agreement with MDD, this Court will not subvert clear precedent limiting VCPA claims to the suppliers themselves and not their agents.

As to MDD, Plaintiffs have pleaded the requisite specificity under the VCPA.  Not only have Plaintiffs plausibly alleged that MDD satisfies the definitional requirements of the statute,

but they have also described with sufficient particularity the manner by which it is alleged to have violated Va. Code § 59.1-200(A)(14).   To support this claim of fraud, Plaintiffs have detailed the manner by which Dennis, acting as an agent of MDD, concealed from Plaintiffs the true cost of the items she purchased from third-party vendors.  Dkt. 1 ¶¶ 27-47.  They have also alleged the specific instances in which Dennis did not take liberty to engage in markups when Plaintiffs were made aware of the true cost via contact with a third-party vendor.  Dkt. 1 ¶ 38 (including specific parties and dates of alleged VCPA violation).

As in *Johnson*, the Complaint provides allegations as to specific items that constituted markups ranging from 20% to 65%.  *Id.* ¶¶ 42-45; *compare id. with Johnson*, 2016 WL 2739270, at **7-8.  Plaintiffs have also attached to the Complaint a declaration from Plaintiffs' architect detailing how Dennis sought to prevent sharing any pricing information with Plaintiffs.[4]  *See* Dkt. 1-2.  Plaintiffs allege they had insisted on the contractual right to receive monthly invoices to confirm the accuracy of pricing, Dkt. 1 ¶ 1, which Defendants assert as an affirmative defense.  But inaccuracy does not, on its own, imply fraud.  This allegation therefore is insufficient to make Plaintiffs' reasonable reliance claim implausible under the 12(b)(6) standard of review.[5]

---

[4]  "In considering a Rule 12(b)(6) motion, the Court may consider attachments to the complaint 'so long as they are integral to the complaint and authentic.'"  *Pickens v. Franke*, No. 1:17-cv-1018, 2017 WL 11505623, at *2 (E.D. Va. Dec. 7, 2017) (quoting *Kensington Vol. Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012)).  Because the declaration spells out the alleged manner by which MDD acted to conceal the true cost of materials from Plaintiffs, this Court considers it integral to the complaint.  Moreover, the document's authenticity has not been put in question at this stage.

[5]  Generally affirmative defenses are not resolved on the merits at the motion-to-dismiss stage.  *See Briscoe v. W.A. Chester, LLC*, 799 F. App'x 183, 183 (4th Cir. 2020).  "But in relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

The source-of-duty rule also does not prevent Plaintiffs from bringing a VCPA claim against MDD.  For one, the Court has recognized the independent footing of a VCPA claim in light of a breach of contract claim.  In *Abi-Naim*, the purchasers of hardwood flooring alleged that their vendor attempted to deceive them by installing a lower grade material.  280 Va. at 384-85.  The purchaser plaintiffs alleged that the defendant had misrepresented the flooring it promised to install in violation of Va. Code § 59.1-200(A)(6), which prohibits the "[m]isrepresentation that goods or services are of a particular standard, quality, grade, style, or model." *Id.* at 361.  The Virginia Supreme Court held in *Abi-Naim* that the VCPA provides "a statutory duty that exists independent of the [c]ontracts entered into between the parties to th[e] litigation" and that "the duty is 'not one existing between the parties solely by virtue of the contract.'" *Id.* at 362.  This Court must adhere to this bright-line rule as Defendants have provided no precedential support for their argument that the catch-all misrepresentation provision of the VCPA, under which Plaintiffs bring their VCPA claim, somehow negates the statutory duty of a supplier not to misrepresent its goods or services in any consumer transaction.  Indeed, in *Johnson*, the Court applied *Abi-Naim*'s reasoning to a VCPA claim under § 59.1-200(A)(14), allowing the claim to live independent of the breach of contract claim in that case. *Johnson*, 2016 WL 2739270, at **7-8.

Therefore, this Court follows Virginia precedent and will permit the VCPA claim to proceed against MDD independent of Plaintiffs' breach of contract claim.

### D.  Count IV – Piercing Corporate Veil

Defendants contend that Plaintiffs have not sufficiently alleged a basis for piercing the veil of MDD because most of the allegations are conclusory and the remaining factual assertions fall short of establishing a prima facie case for any of the factors considered in a court's decision

19

to pierce the veil.  To counter, Plaintiffs argue that the Complaint's allegations, upon information and belief, may be considered by this Court and that such allegations state a plausible claim to pierce.  Plaintiffs further caution that the cases Defendants cite support piercing the veil and the lone case cited that did not pierce did not involve any allegations of fraud.

Virginia courts are "very reluctant to permit corporate veil piercing" as "only an extraordinary exception justifies disregarding the corporate entity in order to hold individual[s] [] personally liable for a judgment against the corporation."  *Dana v. 313 Freemason*, 266 Va. 491, 502 (2003) (citing *Greenberg v. Commonwealth*, 255 Va. 594, 604 (1998)); *see also C.F. Trust, Inc. v. First Flight L.P.*, 266 Va. 3, 10 (2003) ("The decision to ignore the separate existence of a corporate entity and impose personal liability upon shareholders for debts of the corporation is an extraordinary act to be taken only when necessary to promote justice.").  That exacting standard also applies to limited liability companies.  *See A.G. Dillard, Inc. v. Stonehaus Constr., LLC*, No. 151182, 2016 WL 3213630, at *2 (Va. 2016); *Moore v. Law Offs. of Shapiro, Brown & Alt, LLP*, No. 3:14-cv-832, 2015 WL 4877845, at *5 n.5  (E.D. Va. Aug. 13, 2015) (citing *C.F. Trust*, 266 Va. at 12).  "Procedurally, a court may not pierce the LLC veil until after the requesting party obtains a judgment against the LLC."  *In re White*, 412 B.R. 860, 865 (Bankr. W.D. Va. 2009); *see also Dana*, 266 Va. at 499 ("Although . . . the injured party may seek to pierce the veil [] to impose liability against [the members of the corporate entity], such action is dependent upon first obtaining a judgment against the [corporate entity].").

Virginia "has not recognized a single fact or set of facts necessary to pierce the corporate veil;" instead, "[e]ach case must be decided on its specific facts."  *Mid Atl. Eng'g Tech. Servs. v. Miller Hardman Designs, LLC*, No. CL09-2268, 2013 WL 8019593, at *1 (Va. Cir. Ct. Mar. 25, 2013) (citing *Dana*, 266 Va. at 500).  However, the Virginia Supreme Court provides that

piercing the corporate veil may be appropriate when the individual used the corporate entity "to evade a personal obligation, to perpetrate a fraud or a crime, to commit an injustice, or to gain an unfair advantage" or if there is "a unity of interest and ownership . . . such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice." *Dana*, 266 Va. at 500-01 (quoting *O'Hazza v. Exec. Credit Corp.*, 246 Va. 111, 115 (1993)). Courts may evaluate a laundry list of factors including, but not limited to, "the initial capitalization of a corporation, the observation of corporate formalities, the non-payment of dividends, the insolvency of the debtor corporation at the time, the siphoning of funds of the corporation by dominant shareholders, the non-function of other officers or directors, and whether the corporate structure is a sham"; although many of these factors are not weighted as heavily or even relevant for LLC veil piercing analysis. *Mid Atl. Eng'g*, 2013 WL 8019593, at **1-2.

Here, Plaintiffs have identified the elements often relied upon in establishing a claim to pierce the corporate veil. However a resuscitation of the elements is not enough to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. While Plaintiffs have alleged that, upon information and belief, Dennis and MDD are effectively the same, that MDD is undercapitalized and that Dennis siphons off its funds for personal benefit, such allegations are conclusory.[6] *Compare, e.g.*, Dkt. 1 ¶¶ 93-98 *with Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 213 (1987) (finding no grounds to pierce because there was no alleged factual basis to find that a defendant had commingled corporate and personal assets or siphoned corporate assets into their own

---

[6] Allegations based on information and belief may be considered at the motion-to-dismiss stage, and may be considered as part of making the requisite prima facie showing provided that they are factual and not conclusory. *See McNeil v. Faneuil, Inc.*, No. 4:15-cv-81, 2016 WL 11673835, at *4 (E.D. Va. Mar. 1, 2016).

pockets).  Even more, Plaintiffs do not specifically identify the owner of the account in which the $255,000 was wired; instead generally stating that Dennis received the wire, preventing any plausible factual basis to assert the co-mingling of funds or the use of MDD to perpetrate her alleged fraud.  Dkt. 1 ¶¶ 25-26.

The Complaint alleges that Dennis is both the sole owner and sole employee of MDD. Dkt. 1 ¶¶ 93-95.  But "[t]he fact that ownership is concentrated in one or few individuals is not alone sufficient grounds [] for piercing the corporate veil." *In re White*, 412 B.R. at 865. Plaintiffs have alleged that Dennis "conducts all of her personal, non-business activities" through her personal email address, which she also uses for all her business through MDD.  Dkt. 1 ¶¶ 95-96.  That fact, however, does not allow the Court to infer "more than the mere possibility of misconduct" given the demanding evidentiary standard to grant the "extraordinary" event of piercing the veil of an LLC.  *Iqbal*, 556 U.S. at 679; *Dana*, 266 Va. at 502.  And Plaintiffs do not allege MDD "is in any financial difficulty or that any injustice will result from holding" MDD, rather than Dennis, primarily liable.  *Kirkpatrick v. First Am. Title Ins. Co.*, Nos. 61548, 59820, 1985 WL 306765, at * 4 (Va. Cir. Ct. Feb. 25, 1985).

Accordingly, Plaintiffs have failed to state a claim to pierce the corporate veil of MDD at this stage of the action.[7]

## IV.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 9) is GRANTED in part and DENIED in part; and it is

---

[7]  Because piercing the corporate veil may occur only after a judgment has been entered against the LLC, Plaintiffs may still move to pierce the veil upon an adequate showing following discovery.  *See In re White*, 412 B.R. at 865; *Dana*, 266 Va. at 499.

FURTHER ORDERED that Count II of the Complaint is DISMISSED WITH PREJUDICE; and it is

FURTHER ORDERED that Count III of the Complaint is DISMISSED WITH PREJUDICE solely as to Defendant Marlene Dennis in her individual capacity but remains as to Defendant Marlene Dennis Design, LLC; and it is

FURTHER ORDERED that Count IV of the Complaint is DISMISSED WITHOUT PREJUDICE.

The Clerk is directed to forward copies of this Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
May 13, 2022

/s/

Rossie D. Alston, Jr.
United States District Judge